## Simonds's Estate.

201        413
25 SC ²647

*Decedent's estates—Executors and administrators—Evidence.*

Where I. O. U.'s are found amongst a testator's papers in a house of which his daughter, an executrix, had charge, and there is also found in the same place a promissory note from the deceased to the daughter and it is claimed that the note represented the same debts, as the I. O. U.'s, and there is nothing on the face of the I. O. U.'s to show to whom they belong, the burden is on the daughter to show her title to the I. O. U.'s, and if there is no evidence on the subject a claim to them will not be sustained.

*Trust and trustees—Statute of frauds—Parent and child.*

Where a daughter conveys to her father a house under a parol agreement to pay off the liens on the house, and to hold the property in trust for the separate use of his daughter, and thereafter the father sells the house, and subsequently the father makes declarations showing his recognition of the continuance of the trust as to the proceeds, the daughter may after her divorce from her husband and after the father's death recover from her father's estate the amount of the proceeds of the house.

*Executors and administrators—Commissions.*

Where one of two executrixes files an account, the other executrix has no standing to object to the accountant's commissions if reasonable in amount, where it appears that she had on several occasions been obstructive of the administration of the estate, had failed to join in the account, and had never filed any account whatever of the part which she had taken in the administration.

Argued Nov. 6, 1901. Appeal, No. 139, Oct. T., 1901, by Annie D. Hatch, from decree of O. C. Allegheny Co., Sept. T., 1896, No. 188, dismissing exceptions to adjudication in the Estate of George W. Simonds, Deceased. Before McCOLLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Exceptions to adjudication.

HAWKINS, P. J., filed the following adjudication:

1. Mr. Simonds died in 1895, leaving two daughters, Mrs. Annie D. Hatch and Marie Simonds, the latter being called by courtesy his "adopted daughter." Mrs. Hatch was married in 1885, but obtained a divorce in 1890, and was living in Pittsburg, supported by her father. In the mean time Mr. Simonds

had gone to London and brought with him Marie, who was admittedly his illegitimate daughter, and installed her as housekeeper.   When Mrs. Hatch obtained her divorce she returned to her father's house, but jealousy soon sprang up between her and Marie, quarreling resulted, and Mrs. Hatch left the house. A semblance of peace followed the death of Mr. Simonds, and joint letters testamentary were taken out.   An inventory was filed, and some steps were taken towards relieving the estate of financial embarrassment by them; but dispute and litigation ensued and culminated in the present audit.

\*       \*       \*       \*       \*       \*       \*       \*

2. There was found among Mr. Simonds's papers a memorandum to the effect that he had given Marie Simonds a note for $1,200, embracing an aggregation of items of debit.   When Miss Simonds's attention was called to this note, which was found among his papers, she seemed " confused," and said she did " not recollect it."   The fact that he had "given" and was in possession of, the note, of course implied that he had paid it. There is nothing on the face of the " I. O. U.'s" which have been presented here showing to whom they belong ; but assuming that they were the basis of this note as is alleged, if that was paid, the presumption is that these were paid, for they represented the same debt.   In any event, as Miss Simonds had charge of the house in which the papers were kept, at and after her father's death, and was executrice, the burthen is obviously on her to show title, and this she has failed to do : McGeary's Est., 5 Cen. Repr. 852.

3. About the time of Mrs. Hatch's marriage, Mr. Simonds bought her a house and lot in Sedalia, Missouri, in which she took her residence.   Afterward, becoming dissatisfied with Mr. Hatch's business as traveling agent, he suggested a change, and offered to supply the funds ; and accordingly Mr. Hatch located in Kansas City.   Some money was advanced; but when more was needed, it was not convenient for Mr. Simonds, who suggested that Mr. Hatch borrow the security of the Sedalia property, which was accordingly done to the  extent of $2,500. Notwithstanding this aid Mr. Hatch failed in business ; and Mr. Simonds having lost faith in him proposed that if he and his wife would convey the Sedalia property to him, he would pay the liens and hold the property in trust for Mrs. Hatch's

separate use ; this was agreed to, and conveyance was accordingly made upon this trust. About two years afterward the property was sold by Mr. Simonds for $5,000, and the liens paid. Mr. and Mrs. Hatch were divorced in 1895. The following extract from the testimony of Mr. Hatch will best show the situation :

" Q. What was done with the amount realized between the amount of the mortgage and the selling price of the house ? A. Mr. Simonds was to invest the total amount of money for Mrs. Hatch. Q. What total amount ? A. I told him I couldn't take up the mortgage at that time ; and he told me he would give me that; what I had had. We had a good many family quarrels, and he said, 'if you can't get along, you had better quit;' and that he would give Annie this amount of money, and put it at interest for her, and let her have it. Q. Wasn't that the amount of cash realized over and above the amount of the mortgage ? A. No, sir; I don't think it was intended that way at all. Q. Well, what was said by Mr. Simonds about that ? A. Well, he told me the last time—let's see—well, one time when I was here—anyhow I think it was in 1891 or something like that—I told him I couldn't live with her, and that I had got to have a divorce ; and I said, ' I have lost this money out in Topeka, and this mortgage that is on the house.' He had the property then, and had sold it; and he told me that . . . . what Annie had had up to that time she had had ; and what I had had, I had had, and what the others had had, they had had."

In corroboration of this, Mr. Davidson, who drew the conveyance, testified that Mr. Simonds said to Mrs. Hatch in his presence, " I will give you the money to pay off the mortgage of this property if you will deed the property to me in trust so Frank (Hatch) can't have a chance to use it in any way," and that it was on this the conveyance was made.

After sale of the Sedalia property had been made by Mr. Simonds he stated in a letter to his brother the continued existence of the trust, and that there was a balance of $1,450 trust funds in his hands. Although this was a purely ex parte statement, counsel seem to attach importance to it.

Mrs. Hatch having been divorced claims the proceeds of the sale of the Sedalia property; and Miss Simonds pleads the

statutes of frauds, and of limitation, of the state of Missouri in bar.

The court finds as matters of fact: (a) That although a consideration was named in the conveyance, the only inducement thereto was, in fact, the assumption by Mr. Simonds of a separate use trust for Mrs. Hatch in the real estate described, including the payment of liens thereon; and (b) that the existence of this trust was recognized by Mr. Simonds after the sale of said real estate by him.

The only question of law which requires special notice here, grows out of Mrs. Hatch's claim to the proceeds of the Sedalia property.

This transaction grew out of the parental anxiety of Mr. Simonds for the welfare of his daughter, Mrs. Hatch, on the one side, and just expectation of benefits to be received by Mrs. Hatch on the other. In so far as Mrs. Hatch was concerned, protection against the improvidence of her husband, and discharge of liens, were the essential inducements in making the conveyance. She could have sold subject to the liens probably as advantageously as her father, and thus have obtained means for present necessities, but yielded this for the sake of advantages promised by her father. The evidence of creation of this trust, and its recognition afterwards was clear and indubitable; and the confidence reposed was amply justified by the relations of the parties.

It seems clear that if Mr. Simonds had repudiated the trust under which this property was conveyed to him in his lifetime, Mrs. Hatch would have been entitled to equitable relief. His act would have been a gross abuse of the confidential relation which gave life to the transaction: Worrall's App., 110 Pa. 349. The relation of parent and child raises a legal presumption of influence which places on the parents the burden of showing the righteousness of any business dealings with the child and thus affording the court an opportunity of insuring protection to the latter from imposition. Parental influence is not terror and coercion, but kindness and affection which may bias the child's mind and induce it to do that which may be highly imprudent, and which, if the child had been protected, he would never do: Worrall's App., supra. Courts are therefore always solicitous to guard the interests of children from effects of un-

due influence or other fraud, and swift to intervene where circumstances of suspicion appear. The effect of fraud or mistake is more pronounced in equity than at law, and is there recognized as a well established exception to the statute of frauds. It was said in the house of lords that the court of equity had from a very early period decided that even an act of parliament shall not be used as an instrument of fraud; and if in the machinery of perpetrating, an act of parliament intervenes, the court of equity, it is true, does not set aside the act of parliament, but fastens on the individual who gets a title under that act, and imposes upon him a personal obligation because he applies the act as an instrument for accomplishing a fraud. In this manner the court of equity dealt with the statute of frauds, " and where the statute has been most rigidly adhered to, the rule is stated to be that the only exception which equity can make to the statute are those resting on fraud: " Reed on Statute of Frauds, sec. 475. To use the quaint language of Sir THOMAS CLARKE in Peachy's Case (Reed on Statute of Frauds, sec. 474), frauds are " out of the statute of frauds; for that the judges resolved it was absurd that a statute made to prevent fraud should be made a handle to support them." It was said in our own case of Fehlinger v. Wood, 134 Pa. 517, that where there has been a transfer of the fund to the promisor for the payment of a debt he is liable on his verbal promise made to the owner of the fund; or if property charged with the payment of the debt be transferred to him on his promise to the vendor to pay the debt, he is liable notwithstanding the statute of frauds. Hence the statute will not exclude proof of fraud in obtaining a deed; and equity will intervene to prevent fraudulent use being made of it. A trust once established, the liability of the trustee would follow the trust asset through every exchange of form.

But conceding that the statute of fraud was applicable to the conveyance of land, as land, it is clear on the authorities that it had no application to the admission of trust as effecting the proceeds, which was personalty: Hess's Est., 150 Pa. 346. The statute by its terms relates to land alone. Mr. Simonds's recognition of the trust as affecting those proceeds, based as it was on the moral obligation growing out of the original transaction, was undoubtedly binding on him. The transaction as between the father and the daughter

ought indeed to be regarded as in the nature of a family settlement and made effective. It embodied so far as it went, a scheme of advancement which Mr. Simonds seems to have adopted; Marie "had" what had been given her in stocks; Mrs. Hatch "had" what had been given her in the Sedalia property; and Mr. Hatch "had" what had been given him in cash. The suggestion made by counsel that if a trust exist at all it must be limited to the balance due after the payment of the Sedalia mortgage is without merit. This mortgage was given at the instance of Mr. Simonds as an expedient to relieve him from a temporary inconvenience in advancing an instalment of money which he had promised his son-in-law Mr. Hatch. The proceeds were in fact paid Mr. Hatch to enable him to carry on a business undertaken on the strength of Mr. Simonds' promise, and were no doubt part of the moneys afterwards alluded to by Mr. Simonds as that which Mr. Hatch "had had" as his portion. Mrs. Hatch does not seem to have had any wish in the matter, but simply acquiesced in her father's suggestion. Certainly the mortgage was not given in liquidation of any obligation of hers; and if she derived any benefit even indirectly, the evidence does not show it. Her relation to the transaction was that of mere accommodation. It is incredible that Mr. Simonds should have intended to shift to her shoulders the burthen of a scheme which he originated and voluntarily assumed and thus in effect sequestering for the benefit of his son-in-law part of the advancement which he had made to her. In paying off the mortgage he was therefore discharging a debt which he was at least under a moral obligation to pay, and fulfilling a promise of which his son-in-law had been the beneficiary. The Sedalia property then stands as the subject of the trust free from any charge.

The statute of limitation had no application when Mr. Simonds died; and the claim of Mrs. Hatch having fastened on the fund in the grasp of the law—in fact in Mrs. Hatch's hands as the officer of the law—for the purpose of distribution was a bar to its running, if indeed it had any application at all. The absence of any notice of adverse holding on the part of Mr. Simonds would seem to exempt the trust fund from the application of the statute: Marshall's Est., 138 Pa. 260. The reason for the existence of the trust having been satisfied by the pay-

ment of the liens and the divorce, the trust ended, Mrs. Hatch became thereupon entitled to the corpus of the fund: Russell's App., 75 Pa. 269. There was no competent evidence to show that she should receive less than the $5,000 for which the Sedalia property sold. The declaration of Mr. Simonds, as to the balance due, having been ex parte, was of course not binding on her. So far as appears there was never any adjustment of account as between her and the trustee.

The plea of these statutes was to say the least ungracious. As Miss Simonds had been liberally provided for, concession of equality was an obvious equity. The maxim that those who come into court asking, must do equity, is but the expression of a moral obligation.

It follows from what has been said above:

*    *    *    *    *    *    *    *

2. That her claim to the "I. O. U.'s" presented has not been sustained; and

3. That Mrs. Hatch is entitled to the proceeds of the sale of the Sedalia property, viz: $5,000 out of this estate.

In a supplementary adjudication HAWKINS, P. J., said:

Miss Simonds objects to the allowance of credit for compensation of $200 to the accountant, Mrs. Hatch, on the ground that she herself had done as much in the administration, and was therefore entitled to as much. The objection is not well taken. Miss Simonds's conduct has on several occasions been obstructive. Early in the administration, for example, this court was called upon to restrain her from going abroad without making settlement, and at another time from unreasonably interfering with the sale of stocks; and she has in fact not only failed to join the present account, but has never filed any account whatever of the part which she has taken in the administration. In these circumstances the compensation claimed by Mrs. Hatch is amply justified.

Exceptions to the adjudication were dismissed.

*Errors assigned* were (1) in not awarding the appellant the face of the I. O. U.'s with interest; (2) in awarding to Annie D. Hatch any sum whatever on account of the Sedalia, Mo., house and lot or the proceeds thereof; (3) in not sustaining the exceptions to the $200 commission claimed by accountant.

*J. S. Ferguson*, with him *E. G. Ferguson*, for Annie D. Hatch.

*William M. Hall, Jr.*, for Marie Simonds.

PER CURIAM, January 6, 1902 :

The questions raised in the court below and which are now before us on the assignments of error, were all properly disposed of by the learned president judge of the orphans' court, and the decree made is affirmed on his opinion. Both appeals are dismissed with costs.